UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
THE NATIONAL PENSION PLAN OF THE        :
UNITE HERE WORKERS PENSION              :
FUND, JOHN M. AGNELLO, NOEL             :
BEASLEY, HAROLD L. BOCK, JAMES R.       :
BRUBAKER, BRIAN CURTIS, AGNELO          :
DACOSTA, LOUIS D'AMICO, BRUCE A.        :
DUNTON, JOHN FOWLER, JOHN GILLIS,       :
BRIAN MCGRATH, WARREN PEPICELLI,        :
KENNETH PIEHL, JEANNE D. PRATT,         :
BRUCE RAYNOR, HARRIS RAYNOR,            :
HENRY A. SCHEYER, JR., GEORGE W.        :
SHUSTER, and LYNN F. TALBOTT, as        :
Trustees of the UNITE HERE Workers      :
Fund,                                   :
                                        :
                 Plaintiffs,            :
                                        :
        - against -                     :
                                        :
SWAN FINISHING COMPANY, INC., 3G        :
REALTY L.P., JOHN DOES 1-10 (all trades :
or businesses under common control with :
Swan Finishing Company, Inc.),          :
                                        :
                 Defendants.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-11-06

OPINION AND
ORDER

05 Civ. 6819 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

The National Pension Plan of the UNITE HERE Workers Pension

Fund (the "Fund") and the Trustees of the Fund bring this action under sections

-1-

502(a)(3) and 4301(a) of the Employee Retirement Income Security Act

("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of

1980 ("MPPAA") to enforce the provisions of an employee benefit plan to collect

withdrawal liability payments.[1]  Under ERISA, a pension plan may require a

withdrawing employer to pay its proportionate share of the plan's unfunded vested

benefits.[2]  The parties must arbitrate disputes over the amount of withdrawal

liability.[3]  ERISA's pay-first-question-later provisions require the employer to

make withdrawal liability payments in accordance with an initial schedule set by

the plan, notwithstanding the pendency of arbitration.[4]  In the event of a default by

the employer, a plan may require immediate payment of the entire amount of

withdrawal liability.[5]

By Memorandum Opinion and Order dated February 9, 2006

---

[1]     29 U.S.C. §§ 1132(a)(3), 1451(a).

[2]     *See id.* §§ 1381-1405.

[3]     *See id.* § 1401(a)(1).

[4]     *See New York State Teamsters Conference Pension and Ret. Fund ex rel. Bulgaro v. Doren Ave. Assoc., Inc.*, 321 F. Supp. 2d 435, 440-41 (N.D.N.Y. 2004), *aff'd*, 426 F.3d 640 (2d Cir. 2005) (citing  29 U.S.C. §§ 1399(c)(2), 1401(d)).  *Accord Bowers v. Transportacion Maritima Mexicana, S.A.,* 901 F.2d 258, 263 (2d Cir. 1990); *ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.,* 846 F.2d 879, 881 (2d Cir. 1988).

[5]     *See* 29 U.S.C. § 1399(c)(5).

-2-

("February 9 Opinion"), this Court denied 3G Realty Limited Partnership ("3G Realty")'s motion to dismiss for lack of subject matter jurisdiction, granted 3G Realty's motion to compel arbitration, and ordered 3G Realty to show cause why plaintiffs were not entitled to the relief requested in their complaint under ERISA's pay-first-question-later provisions.

Plaintiffs now move for a judgment granting the relief requested in the Complaint. For the reasons set forth below, I conclude that notwithstanding the pendency of arbitration, 3G Realty is obligated to make quarterly payments of withdrawal liability according to the schedule set by the Fund on April 21, 2005, including past-due installments, along with prejudgment interest, liquidated damages, costs, expenses, and attorney's fees.

## II.    BACKGROUND

Swan Finishing Corp. ("Swan") contributed to the Fund as an employer from about 1960 until the sale of its assets on November 1, 2004.[6] Plaintiffs allege that at that time, Swan withdrew from the Fund and incurred liability in the total amount of $1,143,146, to be paid in quarterly installments of

---

[6]      *See* Complaint ("Compl.") ¶ 12; 2/24/06 Declaration of Ralph Guerriero ("2/24/06 Guerriero Decl.") ¶ 7.

-3-

$41,365 beginning May 15, 2004.[7] On June 22, 2005, the Fund accelerated

Swan's withdrawal liability and demanded the full amount based on the Fund's

determination that Swan "lack[ed] creditworthiness" under the terms of the

employee benefit plan and ERISA.[8] Plaintiffs now seek an additional $229,228.60

in prejudgment interest, liquidated damages, costs, expenses, and attorney's fees.[9]

3G Realty "is a passive investment entity formed in about 1990."[10]

Plaintiffs allege that 3G Realty is jointly and severally liable for Swan's

withdrawal liability because it is a "trade or business under common control" with

Swan.[11] Swan's sole shareholders are Ralph Guerriero and his brother Pat

Guerriero.[12] Ralph Guerriero is also trustee of the Ralph A. Guerriero, Jr.

Revocable Trust - 1999, a limited partner of 3G Realty.[13]

3G Realty owns two real estate properties in Massachusetts and has

---

[7]   *See* Compl. ¶¶ 14, 20.

[8]   *Id.* ¶ 24.

[9]   *See* Compl. ¶¶ 35-37.

[10]  2/24/06 Guerriero Decl. ¶ 3.

[11]  Compl. ¶ 10.

[12]  *See* 12/9/05 Declaration of Ralph Guerriero ("12/9/05 Guerriero Decl.") ¶ 2.

[13]  *See* 2/24/06 Guerriero Decl. ¶ 2.

-4-

less than $5,000 in its bank account.[14]  While Swan was a viable business, 3G

Realty leased its two properties to Swan.[15]  Between 1994 and 2005, 3G Realty

also owned a third property in Massachusetts.[16]  3G Realty enters into triple net

leasing arrangements, under which the lessee is "responsible for paying the

expenses of ownership of the properties, including real estate taxes, insurance, and

maintenance expenses."[17]  3G Realty's operations "rarely require any time or

attention from [Ralph Guerriero] or any of the other partners of 3G."[18]  Ralph

Guerriero estimates that he spends approximately twelve hours a year completing

paperwork on 3G Realty's behalf.[19]

        To date, neither Swan nor 3G Realty has made any withdrawal

liability payments to the Fund.[20]  3G Realty argues that it is not liable for Swan's

---

[14]     *See id.* ¶ 3; 3/17/06 Declaration of Ralph Guerriero ("3/17/06 Guerriero Decl.") ¶ 5.

[15]     2/24/06 Guerriero Decl. ¶ 6.

[16]     *See id.* ¶ 4.

[17]     *Id.* ¶ 6.

[18]     *Id.* ¶ 8.

[19]     *See id.* ¶ 5.

[20]     *See* Memorandum of Law in Opposition to Defendant 3G Realty Limited Partnership's Response to the Court's Order to Show Cause ("Pl. Mem.") at 1-2.

withdrawal liability because it is not a trade or business.[21]  3G Realty also argues

that applicable regulations do not allow plaintiffs to accelerate withdrawal liability

while arbitration is pending.[22]  3G Realty claims that it would suffer irreparable

harm if required to pay the accelerated amount of withdrawal liability, because it

would be forced to sell its two Massachusetts properties.[23]  Finally, 3G Realty

argues that ERISA does not entitle plaintiffs to interest, liquidated damages,

attorney's fees, or costs.[24]

## III.  APPLICABLE LAW

### A.    Legal Standard

Because resolution of this order to show cause is a form of summary

disposition, I apply the legal standard for a motion for summary judgment.

Summary judgment is appropriate if the record "show[s] that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a

---

[21]    *See* Memorandum of Law of Defendant 3G Realty Limited Partnership in Response to Court's Order to Show Cause Why Plaintiffs Are Not Entitled to the Relief Requested in Their Complaint ("Def. Mem.") at 1-5.

[22]    *See* Reply Memorandum of Law of Defendant 3G Realty Limited Partnership in Response to Court's Order to Show Cause Why Plaintiffs Are Not Entitled to the Relief Requested in Their Complaint ("Reply Mem.") at 6-7.

[23]    *See id.* at 8; 3/17/06 Guerriero Decl. ¶ 5.

[24]    *See* Reply Mem. at 9.

matter of law."[25] "A genuine factual issue derives from the 'evidence [being] such that a reasonable jury could return a verdict for the nonmoving party.'"[26] A fact is material when it "might affect the outcome of the suit under the governing law."[27] The movant has the burden of demonstrating that no genuine issue of material fact exists.[28] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[29]

### B.    ERISA and the MPPAA

#### 1.    Trade or Business

Section 1301(b)(1) of ERISA provides that "trades or businesses . . . which are under common control" shall be treated as a single employer.[30] Under

---

[25]     Fed. R. Civ. P. 56(c).

[26]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[27]     *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

[28]     *See, e.g., Jeffreys*, 426 F.3d at 553 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[29]     *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004).

[30]     29 U.S.C. § 1301(b)(1).

the MPPAA, trades or businesses under common control are jointly and severally responsible for withdrawal liability.[31] The issue of whether an entity is "'an 'employer' within the meaning of the MPPAA is properly for the courts, not an arbitrator, to determine.'"[32]

ERISA does not define trades or businesses, but courts have held that the "appropriate starting point for this analysis" is the test enunciated by the Supreme Court in *Commissioner of Internal Revenue v. Groetzinger,* defining trade or business for purposes of section 162(a) of the Internal Revenue Code.[33] Under *Groetzinger*, for an activity to be a trade or business, "a person must engage in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity."[34]

---

[31] *See Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 86 (2d Cir. 1997) (citing 29 U.S.C. § 1301(b)(1) and 26 C.F.R. § 1.414(c)-1 through 1.141(c)-5)).

[32] *New York State Teamsters Conference Pension and Ret. Fund v. Express Services, Inc.*, 426 F.3d 640, 646 (2d Cir. 2005) (quoting *Bowers*, 901 F.2d at 261).

[33] *NYSA-ILA Pension Trust Fund v. Lykes Bros., Inc.*, No. 96 Civ. 5616, 1997 WL 458777, at *5 (S.D.N.Y. Aug. 11, 1997) (citing *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23, 35 (1987)). *Accord Central States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 594 (7th Cir. 2002); *Connors v. Incoal, Inc.*, 995 F.2d 245, 250 (D.C. Cir. 1993).

[34] *Neiman*, 285 F.3d at 594 (quotation marks and citation omitted).

-8-

"Beyond this articulation of the test in *Groetzinger*, it is useful to look to the purposes of ERISA and the MPPAA."[35] "The purpose of withdrawal liability 'is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.'"[36] "When Congress defined all members of a controlled group as a single 'employer,' it clearly intended to prevent a business from limiting its responsibilities under ERISA by the fractionalization of its business operations."[37]

---

[35]    *Lykes Bros., Inc.*, 1997 WL 458777, at *6 (citing *Trustees of the Amalgamated Ins. Fund v. Saltz*, 760 F. Supp. 55, 58 (S.D.N.Y. 1991)). *Accord ILGWU Nat. Ret. Fund v. Minotola Indus., Inc.*, No. 88 Civ. 9131, 1991 WL 79466, at *4 (S.D.N.Y. May 3, 1991) ("it is necessary, in light of the absence of any guidance in the statute or regulations as to the definition of the term 'trade or business,' to look to the purpose of the section of the statute in which the phrase appears in order to determine whether a particular set of circumstances is encompassed by its intended meaning") (citations omitted).

[36]    *Levy Bros. Frocks*, 846 F.2d at 881 (quoting H.R. Rep. No. 96-869, Part I, 96th Cong., 2d Sess. 51, at 67 (1980)).

[37]    *Lykes Bros., Inc.*, 1997 WL 458777, at *6 (citing *Pension Benefit Guar. Corp. v. Center City Motors, Inc.*, 609 F. Supp. 409, 412 (S.D. Cal. 1984)). *Accord Board of Trustees of the W. Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987) ("Congress enacted [section] 1301(b) in order to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities."). *Accord Central States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 (7th Cir. 2001).

Courts have held that "the mere possession of property over a period of time [does] not establish regular and continuous activity" where it is "more akin to a passive investment."[38] Thus, simply leasing property is not "'regular and continuous'" activity which renders a defendant liable under section 1301(b)(1).[39] However, "'federal courts . . . have uniformly held that leasing property *to a withdrawing employer* is a 'trade or business' for purposes of section 1301(b)(1).'"[40] "Leasing property to a withdrawing employer is an economic relationship that could be used to [ ] dissipate or fractionalize assets and thus avoid withdrawal liability."[41]

## 2. Acceleration of Withdrawal Liability

---

[38]     *Neiman*, 285 F.3d at 595 (quotation marks and citation omitted).

[39]     *Id.* (quoting *Groetzinger*, 480 U.S. at 35).

[40]     *Pension Benefit Guar. Corp. v. Don's Trucking Co., Inc.*, 309 F. Supp. 2d 827, 831 (E.D. Va. 2004) (quoting *Central States, Se. & Sw. Areas Pension Fund v. Ditello*, 974 F.2d 887, 890 (7th Cir. 1992)) (emphasis added). *See also Central States, Se. & Sw. Areas Pension Fund v. Koder*, 969 F.2d 451, 453 (7th Cir. 1992); *Central States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1374 (7th Cir. 1992); *Board of Trustees of W. Conference of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892, 895 (9th Cir. 1988); *Saltz*, 760 F. Supp. at 58; *Central States, Se. & Sw. Areas Pension Fund v. Lloyd L. Sztanyo Trust*, 693 F. Supp. 531, 537 (E.D. Mich. 1988); *United Food and Commercial Workers Union v. Progressive Supermarkets*, 644 F. Supp. 633, 639 (D. N.J. 1986); *Center City Motors, Inc.*, 609 F. Supp. at 412.

[41]     *Ditello*, 974 F.2d at 890.

-10-

Under ERISA, a plan may accelerate withdrawal liability in the event of a default.[42] The statute defines two types of default:

> (A) the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and

> (B) any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.[43]

Regulations issued by the Pension Benefit Guaranty Corporation ("PBGC") allow plans to adopt rules providing for "additional definitions of default which indicate a substantial likelihood that an employer will be unable to pay its withdrawal liability."[44] The regulations require that "Plan rules adopted under this section shall be reasonable."[45]

PBGC regulations further provide that where arbitration is timely initiated, "[a] default as a result of failure to make any payments shall not occur until the 61st day after" the issuance of a decision by an arbitrator.[46] The Federal

---

[42] *See* 29 U.S.C. § 1399(c)(5).

[43] *Id.*

[44] 29 C.F.R. § 4219.33.

[45] *Id.*

[46] *Id.* § 4219.31(c)(1).

Register publication accompanying the regulation makes clear that this limitation does not apply where the default is based on a substantial likelihood that an employer will be unable to pay.[47] In that case, "unlike in the case of a missed payment, a plan's ability to collect withdrawal liability may very well depend on its power to declare a default and accelerate the full liability . . . even during plan review or arbitration."[48]

### 3. Equitable Exception

Courts have recognized an equitable exception to the requirement to make interim withdrawal liability payments.[49] Such a limited exception applies where "a pension plan's claims were deemed frivolous or not colorable" and an order compelling payment would cause "'unnecessarily harsh and unintended

---

[47] *See* 49 Fed. Reg. 22,642, at 22,644 (1984).

[48] *Id.*

[49] *See Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Mar-Len, Inc.*, 30 F.3d 621, 626 (5th Cir. 1994); *Robbins v. McNicholas Trans. Co.*, 819 F.2d 682, 685 (7th Cir. 1987). *See also Giroux Bros. Transp., Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 73 F.3d 1, 5 & n. 6 (1st Cir. 1996) (acknowledging possibility of irreparable harm exception). *But see Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 141 (3d Cir. 1997) ("We have never held that there are any equitable exceptions to the statutory provisions on interim payments, and we decline to do so now."). The Second Circuit has not addressed this issue.

-12-

results.'"[50]  The Second Circuit has held that a claim under the MPPAA is not

colorable if it is "insubstantial, implausible, or otherwise completely devoid of

merit."[51]  "An inquiry concerning irreparable harm becomes important only if the

employer makes an affirmative showing that the pension plan lacks a colorable

claim."[52]  The poor financial condition of an employer may "cut[] in favor of

requiring the payments be made now, lest the Fund be disadvantaged by other

creditors."[53]

### 4. Interest, Liquidated Damages, Attorney's Fees, and Costs

In any action to collect a delinquent contribution "in which a

judgment in favor of the plan is awarded, the court *shall* award the plan" unpaid

contributions, interest equal to the greater of the accrued interest or an amount not

in excess of 20% of the principal due, liquidated damages under the plan, and

---

[50]     *Trustees of Amalgamated Ins. Fund v. Steve Petix Clothier, Inc.*, No.
03 Civ. 4530, 2004 WL 67480, at *3-4 (S.D.N.Y. Jan. 15, 2004) (holding that
equitable exception did not apply).

[51]     *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir.
1993) (evaluating MPPAA claim in a motion to dismiss).

[52]     *Trustees of Amalgamated Ins. Fund*, 2004 WL 67480, at *4 (citing
*Trustees of the Chicago Truck Drivers Helpers & Warehouse Workers Union
Pension Fund v. Rentar Industries, Inc.*, 951 F.2d 152, 155 (7th Cir. 1991) and
*Lykes Bros., Inc.*, 1997 WL 458777, at *5).

[53]     *Trustees of Amalgamated Ins. Fund*, 2004 WL 67480, at *4.

-13-

reasonable attorney's fees and costs.[54] These mandatory remedies apply to actions to collect withdrawal liability.[55] A court must award these remedies notwithstanding the pendency of arbitration.[56]

## III. DISCUSSION

### A. Trade or Business

3G Realty does not dispute that it was under common control with Swan, or that it engaged in income or profit producing activities. However, 3G Realty argues that it does not engage in any trade or business with "continuity and regularity" because it is a passive investment vehicle.[57] In support of this argument, 3G Realty relies on *Central States, Southeast & Southwest Areas Pension Fund v. Fulkerson*, in which the Seventh Circuit found that individual

---

[54]     29 U.S.C. § 1132(g)(2) (emphasis added). *See also* 29 C.F.R. § 2644.2.

[55]     *See Bowers*, 901 F.2d at 265. *Accord Board of Trustees of Trucking Employees of N.J. Welfare Fund, Inc. - Pension Fund v. Centra*, 983 F.2d 495, 509 (3d Cir. 1992) (when a fund prevails in a suit to compel payment of withdrawal liability "the district court's award of reasonable attorney's fees is mandatory, not discretionary").

[56]     *See, e.g., Caleb V. Smith & Son of Ohio, Inc. v. Amalgamated Ins. Fund*, No. 89 Civ. 8232, 1991 WL 206299, at *6 (S.D.N.Y. Oct. 2, 1991) (award of attorney's fees, costs, interest, and liquidated damages mandatory, notwithstanding the pendency of arbitration) (citations omitted).

[57]     Def. Mem. at 3-5.

defendants who leased property under triple-net leases "that rarely required [] time or attention" were not engaged in trades or businesses for purposes of the MPPAA.[58]  3G Realty also relies on cases interpreting "trade or business" as that term is used in the various sections of the Internal Revenue Code.[59]

*Fulkerson* is readily distinguishable because the defendants did not lease property to the entities that incurred the withdrawal liability.[60]  By contrast, 3G Realty leased two of its three real estates properties to Swan while Swan was a viable business.[61]  As lessee, Swan made payments to 3G Realty that may have otherwise been available for payment to the Fund.  In similar circumstances, courts applying the MPPAA have found leasing proprietorships to be trades or businesses.[62]  This prevents employers from using the leasing relationship to "dissipate or fractionalize assets" in contravention of the purposes of the

---

[58]    238 F.3d 891, 894 (7th Cir. 2001).

[59]    *See* Reply Mem. at 2-5.

[60]    *See Fulkerson*, 238 F.3d at 895 n.1 (noting, nonetheless, that withdrawal liability may be imposed even where there is no economic nexus between businesses under common control).

[61]    *See* 2/24/06 Guerriero Decl. ¶ 6.

[62]    *See Ditello*, 974 F.2d at 890 (collecting cases).

-15-

MPPAA.[63] Cases defining trade or business more narrowly under the Internal

Revenue Code are thus inapposite.[64]

In this case, the MPPAA's purpose of preventing employers from

evading withdrawal liability by fractionalizing assets is directly implicated.[65]

Therefore, neither the limited extent of 3G Realty's management activities[66] nor

---

[63]     *Lykes Bros., Inc.*, 1997 WL 458777, at *5.

[64]     *See id.* (*Groetzinger* is only the "starting point" for analysis of
whether entity engages in "trades or businesses" under the MPPAA; the statutory
purpose must also be analyzed); *Saltz*, 760 F. Supp. at 58 (because "the term 'trade
or business' has no single, well-established meaning in the Internal Revenue
Code" courts must construe the term by "considering the different concerns which
underlie ERISA"); *Fulkerson*, 238 F.3d at 895 n.2 (following *Groetzinger* while
"adher[ing] to the idea that courts must be careful in using tax code cases to
construe MPPAA because of the different context").

[65]     Although the *Fulkerson* court cautioned against a policy-driven
approach to interpretation of the MPPAA, that case sought to avoid an extension
of the policy against fractionalization which would automatically impose
"personal liability on shareholders." 238 F.3d at 897.  In *Fulkerson*, unlike here,
the leasing operation was unincorporated.

[66]     *See, e.g., Saltz,* 760 F. Supp. at 58 (rejecting argument that "lack of
any activity on their part with respect to the management or maintenance of the
Property precludes characterizing their involvement as a trade or business");
*Center City Motors, Inc.*, 609 F. Supp. at 412 ("the fact that one of the commonly
controlled entities bears the majority of responsibilities under the lease does not
prevent the other entity from being considered a trade or business for purposes of
§ 1301").

-16-

the small number of hours spent conducting the business of 3G Realty[67] create a material issue of fact which would preclude a determination that 3G Realty is engaged in "trades or businesses" under the MPPAA. Thus, 3G Realty is jointly and severally liable for the withdrawal liability of Swan under the MPPAA.

## B.    Acceleration

3G Realty argues that under PBGC regulations, its withdrawal liability obligations cannot be accelerated while arbitration is pending.[68] But 3G Realty misinterprets the regulations. PBGC regulations do not allow acceleration until "the 61st day after" the issuance of a decision by an arbitrator only where the default was on account of "failure to make any payments."[69] 3G Realty does not

---

[67]    Even where the defendant did not lease property to the withdrawing employer, this factor is not dispositive. *See, e.g., Painters and Allied Trades Indus. Pension Fund v. KKB, L.L.C.,* — F. Supp.2d — , 2006 WL 658852, at *4 (D. D.C. Mar. 16, 2006) (defendant engaged in regular and continuous activity by owning property and leasing it through a triple net lease, even though the defendant spent less than five hours per year on those activities).

[68]    *See* Def. Mem. at 5-6; Reply Mem. at 6-8.

[69]    29 C.F.R. § 4219.31(c)(1). Additionally, the regulation only applies where arbitration was timely initiated. *See id.* Plaintiffs have argued that defendants did not timely initiate arbitration. The parties dispute the date on which defendants received notice. In the February 9 Opinion, I held that the notice dispute should be resolved through arbitration. *See Bowers,* 901 F.2d at 261 ("any dispute concerning the *notice or amount* of withdrawal liability shall be resolved through arbitration") (emphasis added) (quotation and citation omitted).

have any genuine dispute with the fact that the Fund Manager declared a default based on Swan's substantial likelihood of inability to pay, not based on Swan's failure to make payment.[70]

However, I decline to award the accelerated amount based on the equitable exception to ERISA's pay-now-dispute-later provisions. Plaintiffs lack a colorable basis for acceleration pending the outcome of arbitration. Although plaintiffs allege that the Fund Manager found that *Swan* was likely to be unable to pay its withdrawal liability, plaintiffs do not allege that the Fund Manager found *3G Realty* likely to be unable to pay. As 3G Realty argues, any definition of default that would allow automatic imputation of Swan's lack of creditworthiness to 3G Realty would be "unreasonable" in violation of PBGC regulations.[71] Because plainitffs do not have a colorable claim for acceleration, requiring 3G Realty to sell its real estate assets during the pendency of arbitration would cause irreparable harm, and would be an unnecessarily harsh and unintended result. An order compelling interim payments adequately protects the interests of the Fund at this time.

## C.    Interest, Liquidated Damages, Attorney's Fees, and Costs

---

[70]    *See* Compl. ¶¶ 23-25; Reply Mem. at 7.

[71]    Reply Mem. at 7 (citing 29 C.F.R. § 4219.33).

-18-

3G Realty argues that because plaintiffs have not "prevailed" in this action, the Court cannot award interest, liquidated damages, attorney's fees, or costs. Because I have held that plaintiffs are entitled to immediate payment of past-due installments of withdrawal liability from 3G Realty, awards of interest, liquidated damages (not to exceed 20% of the unpaid contributions), attorney's fees, and costs are mandatory.[72] Moreover, given 3G Realty's failure to cure its default after it had indisputably received notice, there is no equitable reason to deny plaintiffs these forms of relief.[73]

## IV. CONCLUSION

For the foregoing reasons, plaintiffs are awarded partial summary judgment in the amount of those quarterly payments of withdrawal liability which would have been due from May 15, 2004 until the date hereof, along with liquidated damages and interest thereon, and attorney's fees and costs. Plaintiffs

---

[72]    *See, e.g., Caleb V. Smith & Son of Ohio, Inc.*, 1991 WL 206299, at *6. *See also* 29 U.S.C. § 1132(g)(2).

[73]    *See Miller v. ADCO Liberty Mfg. Corp.*, No. 04-CV-3378, 2005 WL 2044901, at *4 (D. N.J. Aug. 24, 2005) ("Given this holding and Adco's undisputed failure to 'cure' its default (by, for example, tendering payment with respect to all its outstanding unpaid quarterly installments) within 60 days of having been served with the Complaint . . . the Court sees no reason why the acceleration, liquidated damages, interest, and attorneys' fees provisions of the MPPAA should not apply.").

shall submit a proposed order consistent with this Memorandum Opinion and

Order by May 17, 2006. The Clerk of the Court is directed to close this motion

(Docket No. 22).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           May 10, 2006

## - Appearances -

*For Plaintiffs:*

Julia Spivack, Esq.
Ronald E. Richman, Esq.
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2375

*For Defendant 3G Realty:*

Neil A. Capobianco, Esq.
Elizabeth D. Bernard, Esq.
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200